## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RICHARD A. BOUTHILLIER     )
                                  )
            Plaintiff       )
                                  )
                                  )     Civil Action No. 08-1004
          v.                   )
                                  )
MICHAEL J. ASTRUE,         )
Commissioner of               )
Social Security,             )
                                  )
           Defendant.     )

<u>MEMORANDUM OPINION</u>

CONTI, District Judge.

Pending before this court  is an appeal from the final decision of the Commissioner of Social Security ("Commissioner" or "defendant") denying the claims of Richard A. Bouthillier ("plaintiff") for supplemental security income ("SSI") under Title XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 1381-83, and disability insurance benefits ("DIB") under Title II of the SSA, 42 U.S.C. §§ 401-33.  Plaintiff asserts that the decision of the administrative law judge (the "ALJ") should be reversed or remanded because the decision is not supported by substantial evidence.  Defendant asserts that the decision of the ALJ is supported by substantial evidence. The parties filed cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.  The court will deny plaintiff's and defendant's motions for summary judgment and will remand this case for further proceedings consistent with this opinion.

**Procedural History**

In October 2004, plaintiff filed an application for DIB and SSI, alleging that his hepatitis C and depression rendered him unable to work since December 1, 2003.  (R. at 111.)  Plaintiff's claims were denied on February 1, 2005. (R. at 69.)  Plaintiff requested and was granted a hearing before the ALJ, which was held on December 6, 2006.  (R. at 37-62.)  Plaintiff, who was represented by counsel, testified at the hearing.  (R. at 41-56.)  A vocational expert ("VE") also testified.  (R. at 56-61.)  On March 7, 2007, the ALJ issued an unfavorable decision (R. at 23-29) and plaintiff timely filed a request for review with the Appeals Council.  (R. at 19.)  After a denial of the request on May 22, 2008, and having exhausted all administrative remedies, plaintiff filed this action.  (R. at 10-12.)

**Plaintiff's Background and Medical History**

**<u>Background</u>**

Plaintiff was forty-eight years old at the time of the hearing and had completed high school and two years of college.  (R. at 42.)  In the past, he worked as a landscape laborer and a utility worker.  (R. at 57-58.)

**<u>Medical History</u>**

On July 29, 2004, plaintiff tested positive for  hepatitis C.  (R. at 156, 261, 270.)  The records indicate that plaintiff had been aware of his hepatitis C for some time, but doctors had been unable to perform treatment due to plaintiff's marijuana addiction.[1]  (R. at 153, 239.)  The

---

[1] Plaintiff was diagnosed with hepatitis B fifteen years earlier and had a history of hyperlipidemia. (R. 150).

hepatitis C caused cirrhosis[2] of plaintiff's liver.  (R. at 51-52, 640.) At a gastroenterology

consultation for his hepatitis C, plaintiff complained of severe fatigue with prolonged exertion.

(R. 155.)  An abdominal ultrasound on November 18, 2004, indicated that plaintiff had

choleslithiasis,[3] biliary sludge in the gallbladder, possible small polyp in the wall of the

galbladder, and minimal fatty infiltration of the liver. (R. 311.)

On April 28, 2005, plaintiff began a forty-eight week Pegintron[4] and Ribavirin[5]

medication treatment to lower his hepatitis C virus count.  (R. at 351, 331-52, 700-36.)  While

undergoing the treatment, plaintiff reported side effects of fatigue, arthralgia/myalgias,

irritability, sleep problems, hair loss, rash, inability to "get going," nausea, diarrhea, loss of

appetite, headache, depression, and tinnitus.[6]  (R. at 331, 334-35, 338, 341, 345, 473, 481-82,

485, 489-90, 492-93, 498, 502, 506.)  On a scale of zero through ten, plaintiff reported fatigue at

separate times at a six through an eight during his course of treatment. (R. at 473, 485, 489-90,

492-93, 498, 502, 506.)  Plaintiff was additionally treated, during this period, for cellulitis[7], boils,

---

[2]A group of chronic diseases of the liver characterized by fibrosis, and by destruction of cells and their regeneration abilities. This disease has a lengthy latent period, usually followed by the sudden appearance of abdominal swelling and pain or jaundice. Dorland's Medical Dictionary 371(31st ed. 2007).

[3]Choleslithiasis is the presence or formation of gallstones;  they may be either in the gallbladder or in the common bile duct. Dorland's Medical Dictionary 341(29th ed. 2000).

[4]Also known as Interferon, this drug is to be used with Ribavirin to treat adults who have a lasting (chronic) infection with hepatitis C virus and who show signs that the virus is damaging the liver. Common side effects include mental health problems; flu-like symptoms; extreme fatigue; appetite problems including nausea, loss of appetite and weight loss; skin reaction, and hair loss. Physicians' Desk Reference 2903, 2910 (63rd ed. 2009).

[5]Also known as Rebetol, this drug is an anti-viral drug used in combination with Interferon to treat patients with chronic hepatitis C infection.  Common side effects are anemia, feeling tired, nausea and appetite loss, rash and itching. Physicians' Desk Reference 2923, 2924 (63rd ed. 2009).

[6] Tinnitus is "a sensation of noise (as a ringing or roaring) that is caused by a bodily condition (as a disturbance of the auditory nerve or wax in the ear) and typically is of the subjective form which can only be heard by the one affected."  Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/tinnitus (last visited on Sept. 3, 2009).

[7] Cellulitis is an acute, diffuse, spreading inflammation of the deep subcutaneous tissues and sometimes muscles, sometimes with abscess formation. Dorland's Medical Dictionary 330 (31st ed. 2007).

and lesions. (R. at 329, 340, 365-69, 372, 374.) Plaintiff's hepatitis C treatment ended March 30,

2006, at which time it was noted that plaintiff demonstrated an early virological response[8] (EVR)

at week twelve and an end-of-treatment response[9] ("ETR"). (R. at 509-10.)

History of drug abuse

Plaintiff became a marijuana addict at the age of fifteen. (R. at 178.) He enlisted in the

military, but was discharged after two years due to marijuana use. (R. at 55, 205, 273-4.) He also

used cocaine until he completed a rehabilitation program in 1989. (R. at 150.)  Plaintiff's

marijuana addiction continued and he was occasionally fired from jobs due to his addiction. (R.

at 273-74.)  On August 30, 2004, plaintiff entered a two-week Center for the Treatment of

Addictive Disorders ("CTAD") program for his marijuana dependence.  (R. at 150, 157.)

Plaintiff participated in classroom educational activities, group sessions, and one-on-one

counseling while in the program. (R. at 151.)  Plaintiff was discharged from the program on

September 16, 2004.  (R. at 150.)  At the time of discharge, plaintiff's drug screen tests were

negative.  (R. at 151.)  Plaintiff was instructed that he was permitted to resume all pre-

hospitalization activities except those that might lead to the resumption of drug use. (Id.)

Plaintiff attended follow-up care sessions at the Butler Veterans Medical Center.  At his

September 22, 2004 visit, Dr. Ripu Jindal, a psychiatrist, indicated that plaintiff's cannabis

dependence was in early remission, but encouraged plaintiff to continue seeking treatment for the

---

[8]An early virological response means that the hepatitis C viral load has dropped by ninety-nine percent, or is undetectable after twelve weeks of treatment. Harrison's Principles of Internal Medicine 1963-64 (17th ed. 2008); I-Base Guides, http://www.i-base.info/guides/hepc/evaluate.html (last visited Sept. 3, 2009).

[9]An end-of-treatment response means that the hepatitis C virus cannot be found using an HCV viral load test at the completion of therapy. Harrison's Principles of Internal Medicine 1963-64 (17th ed. 2008); I-Base Guides, http://www.i-base.info/guides/hepc/evaluate.html (last visited Sept. 3, 2009).

addiction. (R. at 244). This remission was noted again on October 6 and 20, 2004. (R. at 238,

240).

Mental health history

On August 21, 2004, plaintiff argued with his girlfriend, at which time she dared him to

walk in front of a car after he indicated that he was sufficiently upset to commit suicide.  (R. at

152.)  Plaintiff stepped into traffic and a car swerved to avoid hitting him.  (R. at 152, 209, 212.)

One of plaintiff's neighbors observed him walk into the road and called the authorities. (R. at

44.)  Plaintiff was admitted that same day to Butler Memorial Hospital and transferred to the

Pittsburgh Veteran's Administration Medical Center ("VAMC").  (R. at 152-53.)  Plaintiff was

started on Zoloft.[10]  (R. at 218.)

On August 23, 2004, plaintiff's mood was described as "somewhat depressed over his

situation" and he was assessed with a Global Assessment of Functioning ("GAF") of 40.[11] (R. at

209-10.)  He was diagnosed with depression with suicidal ideation. (R. at 215.) He was

recommended for individual and group therapies for both his mental impairments and his drug

addiction. (R. at 210.) During his time in the hospital, plaintiff began experiencing difficulties

---

[10]Zoloft is an antidepressant drug used for the treatment of major depressive disorder. Side effects include nausea, dizziness, loss of appetite, diarrhea, upset stomach, and trouble sleeping. Physicians' Desk Reference 2576, 2582 (62st ed. 2008).

[11]The GAF assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest.   A GAF score of between 31-40 denotes serious impairment. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  American Psychiatric Association:  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).  An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation . . . .)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., . . . suicidal preoccupation)" or "inability to function in almost all areas . . .;  of 20 may have "[s]ome danger of hurting self or others . . . or occasionally fails to maintain minimal personal hygiene . . . or gross impairment in communication . . . ." Id.

with an abscessed wisdom tooth. (R. at 194.) On August 29, 2004, plaintiff and his girlfriend went to the RN and demanded that he have immediate care for his wisdom tooth. (R. at 189.) Plaintiff's girlfriend was adamant about him receiving treatment and threatened to obtain a lawyer and call the news media about his lack of care if he was not immediately seen.  (R. at 189.)

At discharge on August 30, 2004, plaintiff was assessed with a GAF of 40.  (R. at 152.) His speech was spontaneous, coherent, relevant, and goal-directed with normal rate and amplitude. (R. at 152-53.)  His affect and mood were neutral. (R. at 153.) Plaintiff complained of diarrhea since starting Zoloft. (R. at 179.)  After his release from the hospital, plaintiff accepted referral to the CTAD program where he received group and individual counseling. (R. at 151-52.)  At various times plaintiff "appeared interested and participated in discussion" and "made the appropriate comments."  (R. at 158, 162, 164-66.)  At discharge from the CTAD program on September 17, 2004, plaintiff was assessed with a GAF of 50. (R. at 150.)

Subsequent to his completing the CTAD program, plaintiff began treating with Dr. Jindal and a social worker, Martin Sweeney.  (R. at 238-39.)  On September 22, 2004, Dr. Jindal diagnosed plaintiff with depressive disorder and assessed him with a GAF of 55. (R. at 244.) Plaintiff complained of a continuing lack of motivation and his dosage of Zoloft was increased. (R. at 244.)  On October 6, 2004, Dr. Jindal noted some improvement in plaintiff's mood, but plaintiff continued to have trouble sleeping and poor concentration and energy level. (R. at 240.) Further improvement in mood and improvement in sleep were noted on October 20, 2004.  (R. at 238.)  Plaintiff reported, however, that his concentration was still poor.  (R. at 238.)

On November 3, 2004, plaintiff indicated that Zoloft had been very helpful with his mood. (R. at 361.) Dr. Jindal noted that plaintiff had soft stools as a side effect. (R. at 361.) Plaintiff reported the same issues on November 17, 2004. Dr. Jindal maintained his dosage of Zoloft and augmented it with Wellbutrin.[12]  (R. at 362.)  Plaintiff indicated a further improvement of mood on December 1, 2004, and a stable mood on December 29, 2004. (R. at 363-64.)  Plaintiff complained of a mild tremor. (R. at 364.)  He indicated that the tremor had improved on January 31, 2005, and was gone on February 28, 2005. (R. at 579, 580.) On April 6, 2005, plaintiff reported deterioration in his mood due to multiple stressors.  (R. at 578.)

On June 6, 2005, Dr. Jindal increased plaintiff's Wellbutrin due to mood deterioration after starting Interferon for his hepatitis C.  (R. at 576.)  On August 5, 2005, plaintiff requested a medication change from Zoloft and Wellbutrin to Effexor[13]. (R. at 573.)  In August 2005, plaintiff's Effexor dosage was increased due to depressed mood.  (R. at 570-71.)  Plaintiff reported improved mood in October 2005. (R. at 568.)  On May 18, 2006, plaintiff reported that he was laughing inappropriately at times and was concerned about hypomanic symptoms from Effexor. (R. at 567.)  Dr. Jindal switched plaintiff's medication to Lamictal.[14]  (R. at 567.)

Dr. Jindal's Psychological Assessment

On December 11, 2006, Dr. Jindal completed a psychiatric review of plaintiff. (R. at 551-564.)  Dr. Jindal opined that plaintiff met the requirements for Listing 12.04 for an affective

---

[12]Wellbutrin is an antidepressant used for the treatment of major depressive disorder.  Physicians' Desk Reference 1612 (62nd ed. 2008).

[13]Effexor is an antidepressant drug used for the treatment of major depressive disorder. Common side effects include headache, dizziness, drowsiness, weakness, loss of appetite, nervousness, and trouble sleeping. Physicians' Desk Reference 3195, 3196 (63rd ed. 2009).

[14]Lamictal is an anti-epileptic drug used for the treatment of epilepsy. It is also used for the treatment of extreme mood swings associated with bipolar I disorder. Common side effects include dizziness, headache, sleepiness, nausea, vomiting, insomnia, tremor, and rash.  Physicians' Desk Reference 1488, 1498 (63rd ed. 2009).

disorder. (R. at 551, 554.)  He noted that plaintiff suffered from anhedonia, appetite disturbance,

sleep disturbance, psychomotor agitation or retardation, decreased energy, difficulty

concentrating or thinking, and easy distractibility. (R. at 551.)  Dr. Jindal indicated that plaintiff

would have moderate restriction in the activities of daily living; maintaining social functioning;

maintaining concentration, persistence, or pace; and would suffer one to two episodes of

decompensation. (R. at 561.)  Dr. Jindal supported his assessment by noting plaintiff's failed trial

of antidepressants, inappropriate laughter, and residual symptoms while on medication.  (R. at

563.)

### Standard of Review

The Congress of the United States provides for judicial review of the Commissioner's

denial of a claimant's benefits. 42 U.S.C. §405(g).  This court must determine whether or not

there is substantial evidence which supports the findings of the Commissioner.  42 U.S.C.

§405(g).  "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as

a reasonable mind might accept as adequate."  Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir.

1995)(quoting Richardson v. Perales, 402 U.S. 389 (1971)).  This deferential standard has been

referred to as "less than a preponderance of evidence but more than a scintilla."  Burns v.

Barnhart, 312 F.3d 113, 118 (3d Cir. 2002).  This standard, however, does not permit the court to

substitute its own conclusions for that of the fact-finder.  Id.; Fargnoli v. Massonari, 247 F.3d 34,

38 (3d Cir. 2001) (reviewing whether the administrative law judge's findings "are supported by

substantial evidence" regardless whether the court would have differently decided the factual

inquiry).

**Discussion**

To establish disability under the SSA, a plaintiff must demonstrate his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The nature and extent of these mental or physical impairments must be so severe that they preclude the plaintiff not only from returning to his or her previous employment but also from acquiring substantial gainful work that exists in the national economy, considering his age, education, and prior work experience. 42 U.S.C. § 423(d)(2)(A).

The administrative law judge follows a five-step sequential evaluation for determining disability. The five-step process evaluates the following elements: (1) whether the plaintiff is currently engaged in substantial gainful activity; (2) if not, whether the plaintiff has a severe impairment; (3) if so, whether the impairment meets or equals the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app.1; (4) if not, whether the plaintiff's impairment prevents him from performing his past work; (5) and if not, whether the plaintiff can perform any other work in the national economy, given the plaintiff's age, education, and work experience. 20 C.F.R. §§ 404.1520, 416.920. The burden of proof with respect to steps one through four lies with the plaintiff, while the defendant bears the burden of proof with respect to step five. Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

In the instant case, the ALJ determined that: (1) plaintiff has not engaged in substantial gainful activity since the alleged disability onset date; (2) he suffers from the following severe impairments: hepatitis C and depression; (3) these impairments do not satisfy or medically equal

one of the impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) plaintiff is unable to perform any past relevant work; and (5) plaintiff has the residual functional capacity ("RFC") to perform work at the light exertional level and could perform other jobs existing in significant numbers in the national economy.  (R. at 23-29.)

Plaintiff raises three arguments in opposition of the ALJ's findings with respect to step five of the sequential evaluation.  First, plaintiff argues that the ALJ erred by failing to address, analyze, and give weight to the additional medical evidence and physician's evaluation filed after the hearing.  Second, plaintiff asserts that the ALJ improperly determined plaintiff's RFC, which is directly tied to the first argument.  Finally, plaintiff argues that the ALJ improperly assessed his credibility in light of the record.  Each argument will be addressed.

I.      The medical evidence and assessment introduced after the hearing and the determination of plaintiff's RFC (first and second issues raised)

The crux of the three issues raised by plaintiff relate to the medical records and psychiatric assessment performed by Dr. Jindal that were submitted after the hearing before the ALJ.  At the hearing on December 6, 2006, plaintiff's counsel requested that the record remain open for an additional fifteen days for the submission of further evidence. (R. at 41, 62.) Upon granting that request, the ALJ stated, "let me know, alert me if there's any delay that you encounter in regard to getting those documents, and I'll be glad to extend the time, but let's try to move the case along." (R. at 62.)

Included in plaintiff's request for review to the Appeals Council was a faxed letter dated December 19, 2006 from plaintiff's counsel to the ALJ requesting an additional ten days within which to supply additional evidence. (R. at 405-06.)  On December 27, 2006, plaintiff sent a

letter with six sets of attachments to the ALJ, which was stamped as received by the SSA on

December 28, 2006. (R. at 408-09.)  The attached records included the following:

> 1. Records from VAMC regarding diagnosis: Hepatitis C from 7/29/04-9/29/06 (120 pages);
>
> 2. Records from VAMC regarding Computerized Problem List from 7/28/04-11/13/06 (11 pages);
>
> 3. Records from VAMC regarding Carpal Tunnel Syndrome dated 4/26/05 (3 pages);
>
> 4. Records from the VAMC regarding Lab Results from 2004-2006 (28 pages):
>
> 5. Records from VAMC regarding Psychiatric Care from 09/04-12/11/06 (47 pages); and
>
> 6. Records from Butler Memorial Hospital from 08/21/04 (12 pages).

(R. 408-610.)[15]  The ALJ did not render his opinion on plaintiff's case until March 7, 2007.  (R.

at 23-29.)  As a result, it is clear that the ALJ had ample time to consider these records in ruling

on plaintiff's case.  The ALJ in his decision did not discuss any of those records.

Plaintiff alleges that the ALJ erred in not reviewing and weighing these additional

medical records and the included assessment. Defendant argues that these records are duplicative

and that the ALJ properly ignored Dr. Jindal's assessment because it was not probative.

a. Dr. Jindal

Although it is well established that a treating physician's opinion carries more weight

than that of an examining physician, an administrative law judge may reject the treating

---

[15]Plaintiff erred in stating that the full record of pages 408-623 were submitted to the ALJ.  Pages 611-623 are separate exhibits which include records from as late as 2007 and records pertaining to plaintiff's shoulder pain. Those exhibits were not referenced in counsel's letter to the ALJ.  Pages 408-610, however, include the listed records.

physician's opinion by clearly stating the reasons for the rejection. See Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986). Controlling weight is appropriate for a treating physician's medical opinion when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, . . . ." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202 (3d Cir. 2008).

In the instant case, the ALJ did not address the psychiatric assessment of Dr. Jindal even though Dr. Jindal was plaintiff's treating psychologist. (R. at 23-29.) The Commissioner relies on Johnson v. Commissioner of Social Security, 529 F.3d 198, 203-04 (3d Cir. 2008), in support of the argument that Dr. Jindal's report was not probative, and, therefore, did not have to be considered by the ALJ. Johnson clarified that while the ALJ must give reasons for rejecting *probative* or *pertinent* evidence, he does not have to do so for evidence that has no probative value. *Id.* The Commissioner argues that Dr. Jindal's report is not probative for three reasons: 1) it consists of a checked box form; 2) it included an opinion that is reserved to the Commissioner; and 3) it is conclusory.

While checked box forms without an accompanying explanation may be considered weak evidence, the report at hand includes a handwritten explanation of Dr. Jindal's findings, including the medical support utilized. In his report, Dr. Jindal indicated that 1) plaintiff did not properly respond to antidepressant medication (R. at 563); 2) plaintiff had episodes of inappropriate laughter (R. at 563); and 3) while plaintiff was doing well on his present medication, he had residual symptoms that were not taken care of by the medication. (R. at 563.) Dr. Jindal checked boxes indicating that plaintiff suffered from anhedonia, appetite disturbance, sleep disturbance, psychomotor agitation or retardation, decreased energy, difficulty

-12-

concentrating or thinking, and easy distractibility. (R. at 554.)  Considering the supporting evidence provided by Dr. Jindal, as well as his longitudinal treatment of plaintiff, the report is not overly conclusory and had a medical explanation beyond merely checking boxes.  Even if that evidence may be considered weak, the ALJ still needed to discuss why he gave it little weight.  Without that kind of discussion, this court can only speculate about whether the ALJ considered the evidence or, if he did, what were the reasons little weight was given.

Finally, the Commissioner argues that Dr. Jindal's report was properly ignored because it included an opinion that plaintiff met a listing, which is a determination reserved exclusively to the Commissioner.  While Dr. Jindal, plaintiff's treating psychologist, did opine that plaintiff met Listing 12.04, he provided evidence about plaintiff's symptoms and medical findings that supported this conclusion. Dr. Jindal's assessment included probative evidence of plaintiff's symptoms, and was not merely a final conclusion about plaintiff meeting Listing 12.04.   While the opinion about meeting a listing is not probative, the findings about limitations are probative. The ALJ erred in not discussing Dr. Jindal's report because it contained probative evidence of plaintiff's limitations and the ALJ needed to explain why the report was rejected or given little weight.

b.  Plaintiff's additional medical records and RFC

"'"Residual functional capacity'[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'"  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (quoting Hartranft v. Apfel, 181 F.3d 358, 359 n.1 (3d Cir. 1999)).  A claimant's RFC represents the most, not the least, that a person can do despite his or her limitations.  See Cooper v. Barnhart, 2008 WL 2433194, at *2 n.4 (E.D.Pa., June 12,

2008) (citing 20 C.F.R. § 416.945(a)).  In determining a person's RFC, an administrative law judge must consider all evidence of record. 20 C.F.R. §§ 404.1520, 416.920.  Although an administrative law judge can weigh the credibility of the evidence when making a RFC determination, he or she must give some indication of the evidence which is rejected and the reasons for doing so.  Id.   As the court stated in Burnett, "'[i]n the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'"  Id. at 121 (quoting Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981)).

The ALJ erred in failing to consider plaintiff's additional medical records spanning from January 2005 through December 2006.  The Commissioner argues that most of these records are duplicate copies of other records that had previously been submitted and had no probative value. The records, however, include  newly submitted evidence of plaintiff's forty-eight week treatment for hepatitis C from April 2005 through March 2006, which reflect reported side effects.  (R. at 331, 334-35, 338, 341, 345, 473, 485, 489-90, 492-93, 498, 502, 506.)  The records also include most of plaintiff's later psychological treatment records including medication changes and reported side effects. (R. at 567-80.)  This evidence could be probative of plaintiff's impairments and was not considered.  The ALJ did not address any of plaintiff's medical records from January 2005 to December 2006.  Under those circumstances, this court cannot discern whether the records were considered and rejected, and, if rejected, what were the reasons for the rejection.

As this evidence can be probative of plaintiff's impairments, the ALJ should have addressed why the evidence was rejected when determining plaintiff's RFC.  The case needs to be remanded for the ALJ to address the additional medical records and the report of Dr. Jindal.  If the ALJ determines to give little weight to that evidence, the ALJ needs to explain his reasoning.

-14-

II.    The ALJ erred in determining plaintiff's credibility (third issue raised)

The ALJ must give serious consideration to the claimant's subjective complaints, even when those assertions are not confirmed fully by objective medical evidence.  See Mason v. Shalala, 994 F.2d 1058, 1067-68 (3d Cir.1993); Welch v. Heckler, 808 F.2d 264, 270 (3d Cir.1986).   Subjective complaints need not be "fully confirmed" by objective medical evidence in order to be afforded significant weight.  Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981); Bittel v. Richardson, 441 F.2d 1193, 1195 (3d Cir. 1971).  Where a claimant's testimony is reasonably supported by medical evidence, neither the Commissioner nor the administrative law judge may discount claimant's complaints without contrary medical evidence.  Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985); see Chrupcala v. Heckler, 829 F.2d 1269, 1275-76 (3d Cir. 1987); Akers v. Callahan, 997 F.Supp. 648, 658 (W.D.Pa. 1998).

In his opinion the ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. 27.)  In support of this statement, the ALJ relied upon plaintiff's work doing odd jobs as a handyman; a single medical record where plaintiff denied weight loss, fatigue, nausea, vomiting, and diarrhea; an incident where plaintiff demanded dental treatment, plaintiff's early treatment with Zoloft; and plaintiff's ability to shop, pay bills, and watch television.  (R. 27.)

The findings of the ALJ require reassessment.  It is difficult to determine the exact record that the ALJ references with respect to plaintiff denying weight loss, fatigue, nausea, vomiting, and diarrhea. The ALJ may have been referencing plaintiff's record from September 21, 2004

during his psychiatric hospitalization.  (R. 247.)  If so, this reference failed to take into account

the record of plaintiff's hepatitis C treatment from April 2005 through March 2006 and the

weekly medical reports during that period indicating that plaintiff was suffering from regular

fatigue, arthralgia/myalgias, irritability, sleep problems, hair loss, rash, inability to "get going,"

nausea, diarrhea, loss of appetite, headache, and depression due to his Ribavirin medication. (R.

at 331, 334-35, 338, 341, 345, 473, 485, 489-90, 492-93, 498, 502, 506.)  The ALJ also relied on

plaintiff's September 2004 treatment with Zoloft, stating that it reduced his symptoms. There is

no evidence, however, that plaintiff reported that the Zoloft was reducing his symptoms in

September 2004. In fact, plaintiff's doctor increased his dosage of Zoloft in September to

alleviate persistent symptoms.  (R. 244.)

       The remaining evidence relied upon by the ALJ is evidence of plaintiff's behavior.

Plaintiff's odd jobs as a handyman, ability to watch TV, pay bills, and shop, and demands for

treatment on a single occasion are not, in and of themselves, enough to undermine plaintiff's

credibility.  Sporadic and transitory behavior on behalf of a plaintiff does not – standing alone –

disprove disability. Smith, 637 F.2d at 971-72.  "[S]hopping for the necessities of life" does not

signal lack of disability and "disability does not mean that a claimant must vegetate in a dark

room excluded from all forms of human and social activity."  Akers v. Callahan, 997 F. Supp.

648, 659-60 (W.D.Pa. 1998) (citing Smith, 637 F.2d at 971).  Evidence that plaintiff occasionally

did odd jobs like help repair or lay a floor, fix a furnace, and mow grass are not recurring

activities that plaintiff did on a regular basis.  The ALJ acknowledged that plaintiff was

"surviving" by trading these odd jobs for rent.  (R. at 27.)  The ALJ was unclear about how

plaintiff's demand for treatment for an abscessed tooth undermined his credibility concerning his

reported symptoms.  The record indicates that plaintiff did suffer from an abscessed tooth and

was treated for it.  This issue is inextricably intertwined with the need for remand to address the additional evidence submitted by plaintiff after the hearing before the ALJ.  It is not clear to the court whether the ALJ considered plaintiff's credibility in light of the additional evidence.  A remand will be necessary for the ALJ to explain whether the additional evidence would affect the assessment of plaintiff's credibility.

### Conclusion

The ALJ's decision to deny plaintiff DIB and SSI is not supported by substantial evidence of record.  The case will be remanded for the ALJ to review plaintiff's additional medical records and Dr. Jindal's psychiatric assessment in determining plaintiff's credibility and RFC.  On remand plaintiff's counsel should remove duplicate records from consideration by the ALJ; unnecessarily including duplicate records makes the review more difficult and time consuming.  Defendant's motion for summary judgment (Docket No. 17) and plaintiff's motion for summary judgment (Docket No. 15) shall be denied.  This case will be remanded for further proceedings consistent with this opinion.

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: September 9, 2009